# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PATRICIA E. VANKIRK,
      Plaintiff,

v.
                                         **Civil Action No. 2:04CV33**
                                         **(The Honorable Robert E. Maxwell)**

JO ANNE B. BARNHART,
Commissioner of Social Security,
      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant" and sometimes "Commissioner") denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand for Consideration of New and Material Evidence, and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Patricia E. VanKirk ("Plaintiff") filed an application for DIB on February 25, 2002, alleging disability since September 2001, due to a bulging disc at C5-C6 (R. 57-59, 77). Plaintiff's application was denied at the initial and reconsideration levels (R. 35-36, 37-40, 44-45). Plaintiff requested a hearing, which Administrative Law Judge Jay Levine ("ALJ") held on April 25, 2003 (R. 239-266). Plaintiff, "represented" by her husband, a non-attorney, testified, as did her husband and Tim Mahler, a Vocational Expert ("VE"). On May 28, 2003, the ALJ entered a decision finding

Plaintiff was not disabled (R. 17-25). On March 26, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-10).[1]

## II. STATEMENT OF FACTS

Plaintiff was born on September 16, 1963, and was thirty-nine (39) years old at the time of the ALJ's decision (R. 57). She graduated from college in 1985 and had past relevant work as a registered nurse (R. 78, 83, 142-44). Plaintiff alleged disability and the inability to work on September 25, 2001, due to a bulging disc in her cervical spine at C5-6 (R. 57, 77).

On September 9, 2001, Plaintiff was examined by Frank Hartman, M.D., a physician at St. Joseph's Physician Group, for right shoulder pain and numbness in her fingers, which occurred after she had been cutting grass. Dr. Hartman noted Plaintiff had allergies to latex, erythromycin, and NSAIDS. He provided an injection of Medrol and prescribed Vioxx (R. 154). On September 11, 2001, Plaintiff returned to Dr. Hartman. She reported her pain continued in her right shoulder, but that her condition was "better in area of bicep [sic]." Dr. Hartman noted he would refer Plaintiff "to orthopedics if no improvement" (R. 155).

On September 25, 2001, Plaintiff was examined by Joseph A. Snead, M.D. He noted Plaintiff reported pain in her right shoulder and neck, which extended to her elbow, but not to her forearm or fingers. Dr. Snead reported that Plaintiff had been his patient in 1987 for cervical spine strain and that she had undergone an ulnar nerve transposition in the year 2000 for "specific ulnar nerve problems in her fingers," which was resolved (R. 168). Dr. Snead's examination of Plaintiff

---

[1]After the ALJ denied Plaintiff's claim, Plaintiff obtained legal counsel. On November 19, 2003, Plaintiff's lawyer submitted a letter brief in support of Plaintiff's appeal. Plaintiff asserts this letter to the Appeals Council was not contained in the administrative record filed with this Court and included a copy of same to her brief as Attachment A (Plaintiff's brief at pp. 2-3, Plaintiff's Attachment A to brief).

revealed "some tenderness in the inner scapular area the base of the neck and the top of the right shoulder;" pain with active shoulder motion; negative impingement reflexes; and intact pain made worse by head compression. He opined Plaintiff had "cervical spine problems" and not bursitis. He ordered traction through physical therapy and excused her from work for a "couple of weeks" so Plaintiff could avoid lifting (R. 168).

On October 1, 2001, Plaintiff reported to HealthWorks for physical therapy for a cervical sprain (R. 156, 162-66). Plaintiff's physical therapy plan was for two (2) sessions each week for a total of seven (7) weeks (R. 156). Plaintiff attended physical therapy on October 1 and 3, 2001 (R. 160).

On October 4, 2001, Plaintiff was examined by James P. Clark, M.D., an allergist. He found Plaintiff had a latex allergy. Plaintiff reported to Dr. Clark that she had been "doing fine" because the department in which she worked at the hospital had become "latex free" (R. 182).

On October 5, 2001, Dr. Snead found the neck traction that was part of Plaintiff's physical therapy of October 1 and 3, 2001, had "not done any good." He observed Plaintiff had "60 pounds of grip in the right hand 85 in the left" hand and that "her reflexes [were] intact except for some diminished triceps on both sides." Dr. Snead ordered an MRI of Plaintiff's cervical area so he could determine if he was "dealing with a cervical ruptured disc" (R. 167).

On October 8, 2001, and October 10, 2001, Plaintiff returned to physical therapy (R. 157, 159). On October 10, 2001, Plaintiff's physical therapy was suspended by Dr. Snead until the completion of her MRI, which was scheduled for October 25, 2001 (R. 158).

On October 25, 2001, Plaintiff underwent a cervical MRI at St. Joseph's Hospital. "No abnormalities [were] identified about the cord," "no evidence of spinal stenosis" was identified, no

compression deformities were seen, and "[n]o marrow abnormalities [were] identified." The MRI revealed "minimal spurring of the anterior margins of C5, C6, and C7" and a "slight central bulge of the disc posteriorly at the C5-C6 level." A "[d]efinite herniated disc" was not detected (R. 169).

On November 5, 2001, Plaintiff returned to Dr. Snead for a follow up examination. Plaintiff stated she had "pain in her neck that [went] down the left arm to the fingers posterior along the upper arm than [sic] along the ulnar border of the forearm into the ulnar side of the hand." He reviewed the MRI and opined Plaintiff had a "C5-6 bulge" and "no definite herniation." Dr. Snead further opined that he could see, on the sagittal cuts, that the "thecal sac is almost contacted by the bulge at one level." He requested that "Dr. Douglas look at this MRI" to assist him in determining if Plaintiff needed a myelogram and was a candidate for surgery (R. 167).

On February 8, 2002, Plaintiff reported to the emergency department of St. Joseph's Hospital with complaints of "uncontrolled" pain in her neck arm and hand, which had persisted for one (1) to two (2) days (R. 173, 174). Plaintiff was diagnosed with cervical radiculopathy and chronic pain syndrome (R. 172).

On February 25, 2002, Dr. Snead completed a Continuing Disability Claim Form for Colonial Life & Accident Insurance Company, Disability Benefits division. He stated Plaintiff had been unable to work since September 25, 2001, because of right shoulder and neck pain, and her return to work date was "unknown." He noted her prognosis was undetermined because he was "awaiting results of consult with Dr. Douglas" (R. 218).

On March 18, 2002, Plaintiff was examined by Amy Pearson, M.D. Dr. Pearson opined that Plaintiff's range of motion in her right shoulder was reduced and neurological sensations in Plaintiff's right side of her neck, right arm, and right hand were decreased (R. 190).

4

On April 4, 2002, Plaintiff returned to Dr. Clark for a follow-up examination. Plaintiff reported that she had been "doing well." Dr. Clark diagnosed a latex allergy and neck pain. He instructed Plaintiff to return for an examination in one (1) year (R. 181).

On April 23, 2002, Dr. Snead completed a Continuing Disability Claim Form for Colonial Life and Accident Insurance Company, Disability Benefits division, on behalf of Plaintiff. He stated Plaintiff had been unable to work from September 25, 2001, to present because of a cervical sprain which caused right shoulder and neck pain. He stated Plaintiff had a disc bulge at C5-C6 and was awaiting recommendations from Dr. Douglas as to Plaintiff's prognosis (R. 217)

On April 26, 2002, Plaintiff underwent an x-ray of her cervical spine, an MRI of her cervical spine, and an EMG as ordered by Dr. Richard Douglas. The x-ray showed a "[n]ormal appearance of the cervical spine with no subluxation on flexion/extension views" (R. 176). The EMG of Plaintiff's paraspinal area showed the following: 1) bilateral carpal tunnel syndrome with changes more prominent on the right; and 2) no evidence of denervation in C5-T1 myotomes[2] on either side (R. 178). The MRI of Plaintiff's cervical spine showed "[n]o significant neural encroachment or stenosis." There were "[m]inimal or early degenerative changes at C5-6 and also probably also about the C1-2 articulation" (R. 179).

On May 6, 2002, Dr. Pearson completed an Agency Reporting Form Physical for the West Virginia Disability Determination Section. Dr. Pearson noted Plaintiff's height to be five (5) feet, two (2) inches and her weight to be 210.5 pounds (R. 183). Dr. Pearson opined that Plaintiff's special sensory, musculoskeletal, neurological, respiratory, cardiovascular, and digestive functions

---

[2]Myotome: The muscle plate or portion of a somite that develops into striated (skeletal) muscle; a group of muscles innervated from a single spinal segment. *Dorland's Illustrated Medical Dictionary* 1172 (29th Ed. 2000).

were normal (R. 184). She noted Plaintiff was medicated with Vioxx 25 mg. and Lortab 10/650 mg. And diagnosed "bulging disc C5-C6" (R. 185).

On May 15, 2002, Plaintiff returned to Dr. Pearson for a follow-up examination. Plaintiff reported she continued to experience pain, numbness, and tingling in her neck that radiated to her right arm and left clavicle. Plaintiff stated she had had these symptoms for the past seven (7) months and that they were interfering with her ability to sleep. Plaintiff stated she could not "enjoy life at all" and she was "miserable." Plaintiff reported the following: 1) she had an upcoming appointment with Dr. Douglas on June 4, 2002; 2) Dr. Snead had provided her with a month's supply of Percocet and Lortab; 3) she was taking Sarafem 20 mg, Zyrtec, and Flexeril 10 mg; and 4) she had taken Skelaxine on the previous Sunday, which "seemed to help." Dr. Pearson opined that the MRI and EMG of Plaintiff "showed no abnormalities other than bilateral carpal tunnel syndrome." Dr. Pearson observed the results of Plaintiff's examination were "otherwise unchanged." Dr. Pearson diagnosed "[c]hronic pain, etiology uncertain." She prescribed Zanaflex 4 mg and Lortab 7.5/500 mg. Dr. Pearson noted she would "[a]wait evaluation by neurosurgeon on June 4th," and that Plaintiff might "[t]ry Neurontin 300 mg . . . for chronic pain" (R. 186).

On May 31, 2002, Plaintiff telephoned Dr. Clark's office with complaints of her lips and tongue tingling and burning because she had inflated her daughter's "water wings." Plaintiff stated she felt as though food was "stuck" in her throat. Her chest felt tight and her tongue felt burned. Plaintiff was instructed to continue taking Benedryl and to report to a hospital emergency department if her condition worsened (R. 180).

On July 2, 2002, a state-agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 191-98). The physician opined that Plaintiff could occasionally lift

6

and/or carry fifty (50) pounds; frequently lift and/or carry twenty (20) pounds; stand and/or walk for about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday, and push/pull limited (R. 192). The state-agency physician found Plaintiff had no postural, manipulation, visual, communication, or environmental limitations (R. 193-95). The state-agency physician reduced Plaintiffs RFC to medium (R. 196).

On August 20, 2002, Plaintiff was examined by Matthew Darmelio, M.D., upon referral from Dr. Douglas. Plaintiff's chief complaint was a "right shoulder problem." Plaintiff informed Dr. Darmelio that her "arm began hurting" in September 2001 as she cleaned for her mother. She stated she had been treated by Dr. Snead, who "felt it was her cervical spine" and who "thought he saw a herniated disk" on Plaintiff's MRI. Dr. Snead, according to Plaintiff, referred her to Dr. Douglas, who thought Plaintiff's condition was not "her cervical spine, but rather her shoulder." Plaintiff informed Dr. Darmelio that she had undergone physical therapy and had been injected with cortisone, but that neither of those treatments helped her condition. Plaintiff stated she had undergone an "ulnar nerve transposition" by Dr. Lester "in the past." Plaintiff informed Dr. Darmelio that her arm hurt "all the time;" the back of her arm hurt; her hand hurt; overhead lifting "bother[ed]" her; and she did not sleep because of the pain. Plaintiff had also been diagnosed with asthma, fibromyalgia, and allergies to latex and E-mycin. She reported that she was medicated with Ultram, Zanaflex, Zyrtec, Lortab, a Pulmicort inhaler, and Sarafem. Plaintiff reported she did not work outside the home and did not smoke or consume alcohol (R. 199).

A review of Plaintiff's systems by Dr. Darmelio revealed Plaintiff was "[p]ositive for asthma, irritable bowel, numbness and tingling in her hands and the side of her face . . . [and] [n]egative for arthritis." Dr. Darmelio's examination of Plaintiff revealed the following: 1)

tenderness at the supraspinatus and some tenderness at the infraspinatus; 2) forward elevation was 130 degrees; 3) active abduction was 125 degrees with pain at about 90 degrees, which was made better with external rotation of the humerus; 4) external rotation was 60 degrees; 5) internal rogation to about T11; 6) positive impingement test; 7) painful cervical spine range of motion with negative Spurling's, which did not reproduce her shoulder pain; 7) intact sensation to light touch in the hand; and 8) 2+ radial pulse. Dr. Darmelio reviewed the x-rays and MRI of Plaintiff's shoulder; he did not identify a rotator cuff tear. Dr. Darmelio diagnosed "rotator cuff tendonitis [sic]" and recommended physical therapy for "rotator cuff strengthening." He intended to re-examine Plaintiff at the end of September (2002) to evaluate her progress (R. 199).

On August 27, 2002, Dr. Pearson completed a Continuing Disability Claim Form for Colonial Life & Accident Insurance Company, Disability Benefits division. Dr. Pearson stated Plaintiff had be unable to work as a nurse from September 25, 2001, to present. Dr. Pearson noted Plaintiff's injury/sickness was pain in her right shoulder, "which has progressed to joint & muscle pain throughout body." Dr. Pearson listed Plaintiff's primary disabling condition as right rotator cuff tendinitis. She noted Plaintiff "should not" and "cannot" lift and that the prognosis for Plaintiff's recovery was "good." Dr. Pearson opined 1) she expected to see improvement in Plaintiff's condition in "3-4 months;" 2) Plaintiff was not permanently disabled; 3) Plaintiff was not confined to her home; and 4) Plaintiff's activities of daily living were not restricted by the condition (R. 219).

On September 6, 2002, rheumatologist Brian D. Houston, M.D. examined Plaintiff upon referral from Dr. Douglas. Plaintiff presented with "pain primarily involving her shoulders, knees, right side of her neck, feet, hands, right ankle, and left ankle." Plaintiff informed Dr. Houston she

8

was having "problems with the MCPs and PIPs and both wrists." Plaintiff described the pain as "dull" and "achy" and stated it had worsened during the past six (6) months. Plaintiff complained of stiffness in her shoulder for at least two (2) hours in the mornings. She informed Dr. Houston that she had been told she had "rotator cuff tendinitis without a tear" and that she had undergone an MRI which showed the tendinitis. Plaintiff also informed Dr. Houston that one (1) of the two (2) MRI's of her neck showed a bulging disk (R. 201).

Plaintiff stated she "had a thoracic outlet syndrome on the right;" difficulty going to sleep and staying asleep; and difficulty with irritable bowel syndrome for the past two years. Plaintiff reported she did not smoke or drink alcohol, had been "laid off" from her nursing job "about a year ago because she just could not do the job," and had two (2) children (R. 201). Plaintiff informed the doctor that she was allergic to latex, erythromycin, and Bextra and that her current medications included Zanaflex, Lortab, Sarafem, Zyrtec, B-complex vitamin, L-carnitine, and Ultram (R. 202).

Dr. Houston observed the following upon his examination of Plaintiff: 1) her height was five (5) feet, seven (7) [sic] inches and weight was 216 pounds; 2) all vital signs were normal; 3) no adenopathy of the neck was noted; 4) her chest was clear; 5) cardiac exam revealed no murmur, gallops, or trills; 6) she was moderately obese; 7) she had active bowel sounds; and 8) her peripheral pulses were normal. The musculoskeletal examination of Plaintiff by Dr. Houston revealed the following: 1) skin on her fingers was normal; 2) "MCPs," "PIPs," and wrists were tender but not swollen; 3) no active synovitis at elbows was observed; 4) right shoulder revealed mild tenderness and a weak positive impingement sign at ninety (90) degrees; 5) her left shoulder was unremarkable; 6) her neck revealed decreased ear to shoulder motion; 7) her thoracic spine and lumbar spine were non-tender; 8) she had full range of motion of her hips; and 9) her knees, ankles, and "MTPs" were

9

normal (R. 202).

Dr. Houston opined that, "on tender point examination," Plaintiff had allodynia.[3] Tender points were observed at the "lateral epicondyle[4] of the right elbow," "C5 both left and right," the "junction of the 2nd rib and sternum bilaterally," the "right occipital area," the "mid-portion of the trapezius muscle," "both buttocks," "both SI joints," the right trochanteric bursa, and right "medial fat pad" (13 out of 18 tender points) (R. 202). Dr. Houston diagnosed Plaintiff with fibromyalgia syndrome and noted that "some of her symptoms [were] suggestive of an inflammatory arthritis," but considered this diagnosis "probably unlikely" because Plaintiff presented with no swelling or redness. He also noted that the "bone scan would also tend to rule against this [arthritis]." Dr. Houston ordered a blood profile of Plaintiff. He recommended Plaintiff "discontinue the bedtime Zanaflex and start on Amitriptyline 10mg," for which he provided Plaintiff a thirty (30) pill supply and no refill. Dr. Houston instructed Plaintiff to begin walking one-half mile every other day, "with the idea of working her way up to a mile per day" (R. 203).

On September 9, 2002, Dr. Houston completed a Continuing Disability Claim Form for Colonial Life & Accident Insurance Company, Disability Benefits division. He noted Plaintiff's injury/sickness began on September 25, 2001, and was in the form of right shoulder pain, "which has progressed to all over pain." He listed Plaintiff's primary disabling condition as fibromyalgia syndrome and tender points. Dr. Houston opined that Plaintiff's prognosis was "fair," Plaintiff was permanently disabled, Plaintiff was not confined to her house, and Plaintiff was able to perform

---

[3]Allodynia: pain resulting from a non-noxious stimulus to normal skin. *Dorland's Illustrated Medical Dictionary* 51 (29th Ed. 2000).

[4]Epicondyle: an eminence upon a bone, above its condyle. *Dorland's Illustrated Medical Dictionary* 605 (29th Ed. 2000).

activities of daily living (R. 220).

On September 13, 2002, Dr. Houston reviewed the results of Plaintiff's September 6, 2002, blood work and opined each was normal (R. 223).

On September 20, 2002, a state-agency reviewing physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The state-agency physician opined that Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 205). The reviewing physician found Plaintiff had no postural, manipulative, visual, or communicative limitations (R. 206-08). The physician found Plaintiff should avoid concentrated exposure to extreme cold and heat, but that Plaintiff had no limitations in her exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 208). The reviewing physician considered Plaintiff's fibromyalgia, rotator cuff tendinitis, and arthralgia[5] in deciding Plaintiff's RFC was for a medium exertional level of work (R. 209).

On October 7, 2002, Plaintiff was again examined by Dr. Houston. Plaintiff stated the "aches and pains all over" continued; she had been taking Amitriptyline, but had "not noticed much improvement"; and she had walked "all but 5 days since the last time" Dr. Houston had examined her. Dr. Houston's examination of Plaintiff revealed that her "MCPs," "PIPs" and wrists were normal. Tender points were identified at the lateral epicondyle of both elbows, mid-portion of both trapezius muscles, both SI joints, and both buttocks. Dr. Houston's diagnosis was again

---

[5]Arthralgia: pain in a joint. *Dorland's Illustrated Medical Dictionary* 151 (29th Ed. 2000).

fibromyalgia syndrome. Dr. Houston increased Plaintiff's dosage of Amitriptyline to two (2) 10 mg tablets per day and instructed Plaintiff to continue exercising and return in two (2) months (R. 222).

On October 16, 2002, Plaintiff telephoned Dr. Houston's office to report the Ultram was "not helping." Dr. Houston increased Plaintiff's dosage of Amitriptyline to three (3) 10mg tablets per day. On October 23, 2002, Plaintiff was advised to increase her dosage of Ultram 50 mg to four (4) times per day "as per Dr. Houston"(R. 222).

On December 6, 2002, Plaintiff was again examined by Dr. Houston. Plaintiff reported she continued to have "aches and pains all over" and was "not very functional." Plaintiff informed Dr. Houston that she had ceased exercising. She stated she had reported to an urgent care facility "about a month ago;" as a result, her medications were changed. Plaintiff stated she was no longer prescribed Amitriptyline and was now taking Lexapro 10 mg, which was helping her sleep. Plaintiff was also "given some Darvocet −100" at the urgent care facility. The examination of Plaintiff by Dr. Houston revealed her "MCPs and PIPs" were normal. He noted Plaintiff had allodynia and tender points at the lateral epicondyle of both elbows, the mid-portion of the trapezius muscle bilaterally, and both SI joints. He continued to diagnose fibromyalgia and prescribed Flexeril. He instructed Plaintiff to "exercise more and get on a reasonable diet" and to return for an examination in two (2) months (R. 221).

On March 26, 2003, Plaintiff underwent a Disability Determination Examination, conducted by Bennett Orvik, M.D. Plaintiff reported pain, weakness, and decreased range of motion in her right arm; fibromyalgia syndrome; and pain in her joints and muscles (R. 277). Plaintiff informed Dr. Orvik that she felt her symptoms were "gradually getting worse," her activity was reduced, and her fatigue and pain were increased. Plaintiff described her pain as "aching . . ., sometimes with a

12

burning component" and "sometimes . . . quite sharp." The pain was diffused in "various joints and muscles," but there was no radiation of pain. Plaintiff stated her pain was constant and at eight (8) to nine (9) on a scale to ten (10). Plaintiff reported she experienced nausea and occasional diaphoresis[6] with the pain. Weather changes and activity worsened her pain (R. 227). Plaintiff listed Ultram and Darvocet as the drugs she had been prescribed to treat her condition and stated she felt "they do help to a certain extent, but they do not come close to completely relieving her pain." (R. 227-28).

Dr. Orvik's examination of Plaintiff revealed Plaintiff's height to be five (5) feet, one (1) inch and her weight to be 211 pounds. Dr. Orvik opined that Plaintiff was "quite obese." He observed "[h]er overall behavior [was] consistent with her allegations of disability" (R. 229). Plaintiff's neck was supple with "grossly normal appearing range of motion." Auscultation of Plaintiff's lungs revealed no abnormalities. Plaintiff's abdomen appeared normal at examination. Her extremities revealed normal pulses in the radial, brachial, and pedal areas bilaterally. No peripheral edema, cyanosis, clubbing, or deformities were apparent. Plaintiff's sensory examination revealed no abnormalities. Plaintiff's muscle strength was as follows: right arm 3+/5; left arm 4+/5; right leg 4+/5; left leg 4+/5. Deep tendon reflexes were present and symmetric. Plaintiff's straight leg raising was negative in the supine and sitting positions for both right and left. No muscular atrophy was detected. Dr. Orvik observed Plaintiff's "shoulder abduction was markedly reduced in the right to approximately 110 degrees and left mildly reduced to 160 degrees." He found the external rotation of Plaintiff's shoulder was limited to 60 degrees on the right and normal on the left.

---

[6]Diaphoresis: sweating, especially of a profuse type. *Dorland's Illustrated Medical Dictionary* 492 (29th Ed. 2000).

Plaintiff's range of motion of her neck was decreased to 70 degrees on the right and 60 degrees on the left. These restricted ranges of motion, according to Dr. Orvik, were caused by a "combination of stiffness, weakness, and pain." Dr. Orvik opined that Plaintiff's other range of motion measurements were normal (R. 230).

Dr. Orvik observed that Plaintiff's gait "appeared to be generally normal." Plaintiff's stance was normal, she used no assistive devices, and she could tandem walk without difficulty. Plaintiff experienced pain when she walked on her heels and on her toes. She could bend at the waist. She could squat, but needed to "hold on to something for balance and . . . [to] arise." Dr. Orvik observed that Plaintiff could get on and off the exam table without difficulty, but had trouble arising from a chair. Plaintiff reported to Dr. Orvik that she had periodic difficulty dressing and undressing, she was very "stiff" in the morning, and she had limited writing ability because of "hand weakness and poor endurance." Dr. Orvik opined that limitations in Plaintiff's performance were "mainly due to pain" (R. 231).

Dr. Orvik diagnosed the following: 1) "wide-spread musculoskeletal syndrome . . . called Fibromyalgia by rheumatologists;" 2) depression; 3) exogenous obesity; and 4) asthma. Dr. Orvik found that it was "very difficult to judge a treatment response and prognosis for a disease, which is so vague as Fibromyalgia." He opined that her current medications were "generally appropriate," but that other medications could be included in her regimen (R. 231). Dr. Orvik summarized Plaintiff's complaints and correlated them to her physical findings as follows: Plaintiff "has complaints of a diffuse musculoskeletal pain syndrome with weakness, most prominent in her right arm and shoulder area. On physical examination, she was found to have some right arm weakness and some decrease in range of motion consistent with general complaints." In response to the

14

question, "What is the claimant able to do despite her impairment?," Dr. Orvik stated:

> She is well educated and has a nursing degree. If an appropriate type job could be found which could use her educational skills & not require a whole lot of physical activity she might very well be able to do the limited physical exertional type job. She has only limited typing and computer skills and has difficulty with writing if she has to write for very long at one time.

(R. 232).

On March 27, 2003, Dr. Orvik completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form. He opined Plaintiff could occasionally lift and/or carry less than ten (10) pounds, frequently lift and/or carry less than ten (10) pounds, stand and/or walk less than two (2) hours in an eight (8) hour workday, periodically alternate sitting and standing, and push and pull on a limited basis with her upper extremities (R. 235-36). Dr. Orvik found Plaintiff was limited to occasional climbing, balancing, kneeling, crouching, crawling, and stooping (R. 236). She was also limited to occasional reaching in all directions, fingering, and feeling. Dr. Orvik found Plaintiff had no handling, visual or communicative limitations (R. 237). He opined Plaintiff would need to limit her exposure to fumes (R. 238).

At the administrative hearing conducted on April 25, 2003, Plaintiff testified she last worked on September 25, 2001, stopping because of pain and difficulty with her hands (R. 247-48). She stated she experienced "horrible pain in my arm, my neck, my head," and "chronic headaches like everyday." She testified she was diagnosed with rotator cuff tendinitis and fibromyalgia and that her pain was constant "everywhere, even my little toes ache" and manifested itself as an "achy, sick feeling" as though she had the flu (R. 249). In addition to pain in her right shoulder because of her rotator cuff condition, she had begun experiencing pain in her left shoulder (R. 253-54). She also testified that she had experienced "a lot of problems with [her] lower back as well and [her] feet"

15

(R. 254).

Plaintiff testified she had been diagnosed with a latex allergy and the department in which she had worked at the hospital was enclosed and had gone latex free so she could continue working (R. 256). Additionally, she testified that when she would "get in crowds and there's a lot of noise, . . . I'll have to get myself away from there. It's like I can't think, I can't do anything, you know, and [am] real sensitive to noises . . . ." Plaintiff also stated she had trouble "remembering things . . . simple everyday things" (R. 258). When asked by the ALJ if she had anything else she wished to present regarding her condition, Plaintiff stated . . . "[A]nd of course the depression that goes along with it." She testified she had never been referred to counseling (R. 259). She also testified she had "carpal tunnel," which caused her hands to "ache all the time." She had not been provided "splints" to wear as treatment for this condition. Plaintiff informed the ALJ that she had the condition since the birth of her daughter and that her hands did not "fall asleep at night" (R. 262).

Plaintiff testified that her daily medications included Ultram, Zanaflex, Darvocet, Zyrtec for allergies, and Lexapro as an antidepressant (R. 256, 257).

The ALJ posed the following hypothetical question to the VE:

Assume a hypothetical individual, the Claimant's age, education, work experience, assume this person is restricted to a light range of work. Person needs a sit/stand option. This person is precluded from work that requires more than very frequent lifting of objects above the plane of the shoulder unless it's with the non-dominant hand, but in general it precludes jobs that would require repetitive lifting over the plane of the shoulder. Also this job, or this person is precluded from work that would require more than occasional twerking [phonetic] or twisting of the wrist. For example a job that would require the same movement that would – that you use to twist off a cap, anything more than occasional motion of that type is precluded. Also the person is precluded from climbing and working on unprotected heights. Also the person is limited to just occasional stooping, kneeling, crouching, crawling. The person should avoid temperature extremes. Also the person is limited to working primarily with things rather than people, doesn't preclude all contact with the public

16

or coworkers, but a person should not be in an environment where she's surrounded by the public. For example, a cashier in a department store would be precluded, that type of work. Is there work in the national or regional economy such a person could perform? (R. 263-64).

The VE responded:

Some jobs I could offer would comply with that with a sit/stand option dealing with things and not people, no reaching overhead, occasional stooping, no temperature extremes and no torqueing [phonetic] or twisting of the wrist, only occasionally, not repetitively. There are inspector/checkers of small products, 800 local, 111,000 nation. There are labelers and markers, 300 local, 64,000 nation. And there are hospital television rental clerks, 70 local, 40,000 nation. And there are office helpers, 350 local, 130,000 nation. These are all at the light level, Your Honor (R. 264-65).

The ALJ then asked the VE the following question:

Hypothetical two is assume a hypothetical individual with the same restrictions as above. This person is going to be off task 25 percent of the time or more due to the effects of pain or fatigue or psychological based symptoms of depression. Is there work they could perform? (R. 265).

The VE responded:

No, Your Honor. There is not. Nothing competitive employment [sic]. As far as sustaining even simple routine entry level competitive jobs, you have to be on task functioning independently within the work schedule, not taking any extra breaks and you have to function at least 85 percent of the workday to sustain competitive employment (R. 265-66).

## NEW EVIDENCE

Sometime after the ALJ's decision, but before the Appeals Council decision, Plaintiff retained counsel. In Plaintiff's brief, counsel contends he submitted new evidence along with a letter to the Appeals Council. The Appeals Council, however, does not mention the letter or the new evidence in its decision. The evidence was not included in the administrative transcript. Counsel therefore attached the letter and new evidence to Plaintiff's brief, in part to support her Motion for Remand, and in part to show the type of evidence the ALJ should have obtained in order to fully

develop the record regarding her depression. The evidence includes a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment completed by a DDS reviewing psychologist six months after the ALJ's decision, a Mental Status Examination performed by a consultative psychologist, and a PRT and Mental RFC completed by a DDS Psychological Consultant. This evidence was all apparently obtained by the Administration pursuant to a new claim filed by Plaintiff shortly after the claim at bar was denied by the ALJ. It was all dated before the Appeals Council decision in this case.

In November 2003, Dr. Kuzniar, the State agency psychologist, opined that Plaintiff's depression would cause a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (*see* Plaintiff's Exhibit A). Dr. Kuzniar expressly referenced the ALJ's decision in this matter, and stated:

> The ALJ decision is given some weight as it does not reflect the limitations in [concentration persistence or pace] skills as reported in the ADL Q.

In the MRFC, Dr. Kuzniar opined Plaintiff would have moderate limitations in her ability to maintain attention and concentration for extended periods; her ability to work in coordination with or proximity to others without being distracted by them; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.*

The Mental Status Examination performed by Thomas Stein, Ed.D. in March 2004, indicated Plaintiff had objective symptoms of poor concentration and a moderately depressed mood. *Id.* Dr.

Stein found Plaintiff's concentration moderately deficient, her persistence mildly deficient, and her pace moderately slow. He diagnosed Major Depression, single episode, non-psychotic and Pain Disorder associated with general medical condition and psychological factors.

Psychological Consultant Michael Cater, Ph.D. opined Plaintiff had an affective disorder as well as a somatoform disorder. *Id.* He opined Plaintiff would have a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. He opined she was moderately limited in her ability to understand, remember and carry out detailed instructions and maintain attention and concentration for extended periods. *Id.*

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Levine made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

19

7.  The claimant has the following residual functional capacity: She can perform light work activity with a sit/stand option; that does not involve frequent lifting of objects over the shoulders; that does not require more than occasional twisting of the wrists such as twisting caps off of jars; that does not involve work at unprotected heights or around dangerous machinery; that involves no climbing; that requires only occasional stooping, kneeling, crouching, or crawling; that does not involve exposure to temperature extremes; and that involves working with things, not people, which does not preclude all contact with the public or co-workers, but does not require being surrounded by a lot of people.

8.  The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

9.  The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

10. The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

11. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as an inspector/checker, with 800 jobs locally and 111,000 nationally; as a labeler/mailer, with 300 jobs locally and 64,000 nationally; as a hospital TV rental clerk, with 70 jobs locally and 40,000 nationally, and as an officer helper, with 350 jobs locally and 130,000 nationally.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)) (R. 23-25).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ did not develop the record concerning her mental impairments;

2. The ALJ did not properly determine her limitations due to her physical impairments and latex allergy; and

3. New and material evidence indicates her mental impairments were much more limiting than determined by the ALJ.

The Commissioner contends:

1.  Substantial evidence supports the ALJ's evaluation of the medical evidence and opinions of record.

2.  Substantial evidence supports the ALJ's determination regarding the credibility of Plaintiff's subjective complaints.

3.  The ALJ's hypothetical question accurately set forth the limitations resulting from Plaintiff's impairments.

### C. Severe Depression

Plaintiff first argues the ALJ failed to properly develop the record concerning her severe depression. The ALJ determined Plaintiff had depression, and further determined the depression was a severe impairment. Despite this finding, he did not refer her for a psychological evaluation. He did not refer the case to a reviewing DDS psychologist. He determined Plaintiff's mental RFC without the assistance of a mental health provider. Nor did he question Plaintiff regarding the symptoms of her depression. The ALJ asked only if she had requested her doctors refer her for psychological counseling, to which Plaintiff replied that she had not (R. 259). Plaintiff's husband then stated that neither he nor Plaintiff had ever thought about counseling, believing the depression was just a part of her fibromyalgia. She did testify she was taking antidepressants.

Although, as the ALJ states, Plaintiff was "represented" by "John B. VanKirk, a non-attorney," the undersigned notes that Mr. VanKirk is Plaintiff's husband. He works as a teacher at a Christian school and part-time as a contractor. There is no evidence he has any legal experience or experience with Social Security Disability or administrative hearings. The undersigned therefore finds Plaintiff was actually acting *pro se* at the time of the administrative hearing and ALJ's decision. The Fourth Circuit has long held that in *pro se* cases, ALJs have "a duty to assume a more active role in helping claimants develop the record. *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980).

The undersigned notes that the ALJ did not inquire at the hearing as to whether Plaintiff understood

she had a right to counsel. In *Hartsell v. Bowen*, 861 F.2d 264 (Fourth Cir. 1988)(unpublished),[7] the

Fourth Circuit stated:

> It is customary for an ALJ, before initiating testimony from *pro se* claimants, to inquire whether they understand that there is a right to counsel. There is no record of the ALJ informing Mrs. Hartsell of this right. A notice from the Social Security Administration, addressed to Mrs. Hartsell and advising her of her right to be represented by counsel, was sent to her home before the hearing, but there is no evidence that she ever received it or, if she did, that she understood it. A copy of the notice was placed in the transcript, but it was not marked as an exhibit and introduced into evidence at the hearing.

> The Secretary has no duty to insist that a claimant have counsel. *Marsh v. Harris,* 632 F.2d 296 (4th Cir.1980). The fact that Hartsell was not represented by counsel is not in itself reason to reverse the Secretary's decision denying benefits. An ALJ should always take special account, however, of any impairment, such as the lack of counsel, that might effectively disable a claimant from substantiating her claim. In this case, the ALJ might well have inquired whether Mrs. Hartsell was aware of her right to obtain counsel.

> Where absence of counsel creates clear prejudice or unfairness to claimant, a remand to the Secretary is proper. *Sims v. Harris,* 631 F.2d 26 (4th Cir.1980). An attorney in this case may have been able to elicit more information about the pain that Mrs. Hartsell claims to have been experiencing and may have been able to expand the testimony on her former job duties.

Sometime after the ALJ's decision, but before the Appeals Council decision, Plaintiff did

retain counsel. In her brief, Plaintiff's counsel contends he submitted new evidence along with ta

letter to the Appeals Council. The Appeals Council, however, did not address the letter or new

evidence and did not include either in the administrative transcript. Counsel therefore attached the

letter and new evidence to Plaintiff's brief, in part to support her Motion for Remand, and in part to

show the type of evidence the ALJ should have obtained in order to fully develop the record

---

[7] A copy of *Hartsell* is attached as required by CTA4 Rule 36(c).

regarding her depression. The evidence includes a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment completed by a DDS reviewing psychologist only six months after the ALJ's decision, a Mental Status Examination performed by a consultative psychologist, and a PRT and Mental RFC completed by a DDS Psychological Consultant. These were all apparently obtained by the Administration pursuant to a new claim filed by Plaintiff shortly after the ALJ denied her claim but before the Appeals Council decision.

Although the undersigned does not address the merits of the new evidence he does agree with Plaintiff that this new evidence is a good representation of the type of evidence the ALJ in this claim should have sought. Instead, the ALJ decided that Plaintiff's severe depression could be accommodated by requiring only that she be employed in a job that involved "working with things and not people, which does not preclude all contact with the public and co-workers, but does not require being surrounded by a lot of people." (R. 21).

The undersigned finds the ALJ failed to fully develop the record regarding Plaintiff's mental impairments, and that this failure prejudiced Plaintiff. Substantial evidence therefore does not support the ALJ's determination that Plaintiff was not disabled at any time throughout the date of his decision.

### D. Physical Impairments/ Latex Allergy

Plaintiff next argues the ALJ did not properly determine her limitations due to her physical impairments and her latex allergy. Plaintiff particularly argues the ALJ erred by rejecting Dr. Orvik's opinion that she was limited to work at the sedentary exertional level. The undersigned agrees with Plaintiff, but not for the reasons argued in her brief. Instead, the undersigned finds the ALJ erred by not including obesity or latex allergy/asthma as medically determinable impairments. Social

24

Security Regulation ("SSR") 02-1p, provides, in pertinent part:

**How Do We Consider Obesity in the Sequential Evaluation Process?**

We will consider obesity in determining whether:

> The individual has a medically determinable impairment. See question 4.
>
> The individual's impairment(s) is severe. See question 6.
>
> The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings. See question 7. (We use special rules for some continuing disability reviews. See question 11.)
>
> The individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy. However, these steps apply only in title II and adult title XVI cases. See questions 8 and 9.

**How Is Obesity Identified as a Medically Determinable Impairment?**

> When establishing the existence of obesity, we will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height. Thus, in the absence of evidence to the contrary in the case record, we will accept a diagnosis of obesity given by a treating source or by a consultative examiner . . . .

Plaintiff was 5'1" or 5'2" tall and weighed 210 - 211 pounds (R. 183). In addition, Dr. Orvik expressly diagnosed Plaintiff with significant obesity (R. 229-230). Obesity is therefore clearly a medically determinable impairment under the Ruling. The ALJ mentioned Dr. Orvik's diagnosis, but failed to recognize obesity as a medically determinable impairment, or consider obesity throughout the remaining steps of the sequential analysis as is required by the Ruling. A review of the decision shows that, aside from the one mention of Dr. Orvik's diagnosis, the ALJ never considered Plaintiff's obesity at all in making his determination. This omission is of particular significance in this case because, as the Ruling states:

> [Obesity] commonly leads to, and often complicates, chronic diseases of the
> cardiovascular, respiratory, and musculoskeletal body systems [and] may also cause
> or contribute to mental impairments such as depression . . . . The effects of obesity
> may be subtle, such as the loss of mental clarity and slowed reactions that may result
> from obesity-related sleep apnea.

The ALJ found Plaintiff's complaints of pain and limitations not entirely credible. Plaintiff's obesity, however, may have worsened her pain and limitations, and may have contributed to or worsened her depression. Substantial evidence therefore does not support the ALJ's determination of Plaintiff's impairments and limitations.

Plaintiff argues the ALJ erred by failing to include any limitation due to her latex allergy. The ALJ noted Plaintiff had diagnoses of "history of asthma" and "latex allergy which occasionally caused asthma." He found she had asthma, but that it was not a severe impairment, explaining:

> The claimant stated that since she is no longer working, it has not bothered her as
> much. The records do not show significant treatment or limitations related to this
> condition.

(R. 20). Even if it is not a severe impairment, the asthma and/or latex allergy is, however, at least a medically determinable impairment. Plaintiff testified that even "flipping" a pair of latex gloves past her caused bronchial spasms. She further testified that she had been able to continue working as a registered nurse despite the allergy only because her department was enclosed and went "latex free." In a pre-hearing letter to the ALJ, Plaintiff noted her allergy medication and visits to her allergist were paid for by Workers' Compensation, evidencing it was a work-related impairment. 20 CFR § 404.1523 provides:

> In determining whether your physical or mental impairment or impairments are of a
> sufficient medical severity that such impairment or impairments could be the basis
> of eligibility under the law, we will consider the combined effect of all of your
> impairments without regard to whether any such impairment, if considered
> separately, would be of sufficient severity. If we do find a medically severe
> combination of impairments, the combined impact of the impairments will be

considered throughout the disability process . . . .

The ALJ was therefore required to consider Plaintiff's latex allergy/asthma, in combination with all her other impairments, throughout the remainder of the decision. He did not do so.

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (*citing Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. *Edwards v. Bowen*, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993).

The ALJ here did not present to the VE any limitation caused by Plaintiff's latex allergy. He correctly noted that "since she is no longer working, it has not bothered her as much." That, however, is just the point. Plaintiff states she has carefully avoided latex since she stopped working, with the exception of one occasion when she blew up her young child's "water wings." She complained to her physician on that occasion of symptoms including chest tightness, lip and tongue tingling and burning, and a feeling that food was "stuck" in her throat (R. 180).

The ALJ's hypothetical to the VE therefore did not "present[] those impairments the claimant allege[d]." *Id.* Based on the VE's testimony, the ALJ found Plaintiff could perform the jobs of inspector/checker, labeler/mailer, hospital TV rental clerk, and office helper. Neither the ALJ nor the undersigned can be certain, however, that those jobs do not require contact with latex.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff was not disabled at any time through the date of his decision.

### V. Motion for Remand for Consideration of New and Material Evidence

Plaintiff has moved in the alternative for a Remand for Consideration of New and Material Evidence. Plaintiff contends she submitted this evidence to the Appeals Council, but it was not considered or included in the administrative transcript. She therefore submitted the evidence to the Court. The evidence consists of a PRT and Mental RFC completed in November 2003 by State agency reviewing psychologist Joseph Kuzniar, Ed.D., a Mental Status Examination by Thomas Stein, Ed.D. performed at the request of the State agency in March 2004, and a PRT and Mental RFC completed by State agency Psychological Consultant Michael E. Carter, Ph.D.

Because the undersigned recommends this matter be remanded to the Commissioner for the

reasons already stated herein, he does not address the merits of Plaintiff's Motion to Remand based on this new evidence. The undersigned therefore recommends Plaintiff's Motion for Remand for Consideration of New and Material Evidence be denied as mooted by the recommendation herein.

On remand, both parties shall be permitted to submit evidence they believe is relevant to the claim at issue.

## VI. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation. I further recommend Plaintiff's Motion for Remand for Consideration of New and Material Evidence by **DENIED** as mooted by this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984),

*cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _31_ day of August, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

Westlaw.

861 F.2d 264

861 F.2d 264, 1988 WL 109271
(Cite as: 861 F.2d 264)

**c**
861 F.2d 264, 1988 WL 109271
NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a " Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
Bathsheba HARTSELL, Plaintiff-Appellant,
v.
Otis R. BOWEN, Secretary Department of Health & Human Services, Defendant-Appellee.
No. 88-3935.

Argued: June 6, 1988.
Decided: Oct. 6, 1988.

D.Md.

GRANTED WITH INSTRUCTIONS.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Joseph H. Young, Senior Judge. (CA Y-87-1665)

Timothy Edward Mering (Robert R. Jenkins, Paul R. Schlitz, Jr., JENKINS & BLOCK, P.A., on brief), for appellant.
James Anthony Winn, Assistant Regional Counsel (Beverly Dennis, III, Chief Counsel; Charlotte Hardnett, Chief, **Social Security** Litigation Division; Paul S. Ceja, Assistant Regional Counsel; Office of the General Counsel, Department of Health and Human Services; Breckinridge L. Willcox, United States Attorney; Larry D. Adams, Assistant United States Attorney, on brief), for appellee.

Before HARRISON L. WINTER, Chief Judge, JAMES DICKSON PHILLIPS, Circuit Judge, and PAUL V. NIEMEYER, United States District Judge for the District of Maryland, sitting by designation.

PER CURIAM:
*1 Bathesheba Hartsell appeals from the decision of the United States District Court for the District of Maryland, which affirmed the Secretary of Health and Human Services' denial of her claim for **Social Security** disability insurance benefits. The district court found that the decision of the Secretary was supported by substantial evidence. Appearing before the Administrative Law Judge (ALJ) *pro se,* Hartsell was not advised of her right to counsel and she failed to develop a sufficient record of her pain to afford her an award of disability. Since the decisions of the Secretary and the district court below, she has undergone an anterior cervical fusion for which she now has a new claim for disability pending. In view of this change of condition, she filed a motion to remand this matter. Without deciding whether this newly evidenced condition is objective evidence of the pain that was sketchily described in the record below or whether it is an unrelated event, we will grant the motion to remand this case based on the combination of the unique circumstances of her earlier hearing and the newly pending claim.

I

Mrs. Hartsell is a 60-year-old woman with an 11th grade education. The record reflects that she suffers from a variety of medical problems, including diabetes, hypertension, obesity, and heart disease. She has been treated for various complications of these illnesses, such as peripheral neuropathy, diabetic retinopathy, headaches, urinary tract infections, and drug reactions to medication.

For many years, Mrs. Hartsell worked in her family's business running a gas station and delivering newspapers. From 1967-76 she worked for Holiday Inn and from 1977-85 for the Bonfire Restaurant as a "shift manager." She substituted as cook, cashier, dishwasher, waitress or bar manager whenever necessary. On May 25, 1985, she was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

861 F.2d 264

861 F.2d 264, 1988 WL 109271
**(Cite as: 861 F.2d 264)**

laid off and has not been employed since then. She tried to find employment in the restaurant field in the latter part of 1985 but abandoned those efforts after January 1986.

Mrs. Hartsell filed her initial application for disability insurance benefits on September 5, 1985, alleging an onset date of disability of May 25, 1985. Her claim was denied initially and on reconsideration. Following a hearing held on September 12, 1986, the ALJ found no medical evidence of an impairment that would prevent Mrs. Hartsell from engaging in her former work as a restaurant manager.

Mrs. Hartsell was not represented by counsel at the hearing, and the ALJ did not inform her of her right to retain counsel. The hearing lasted 27 minutes and consisted essentially of Mrs. Hartsell's responses to a format of questions from the ALJ. Most of the evidence at the hearing concerned the objective medical facts of Mrs. Hartsell's illnesses, the diagnoses and expert opinions of physicians, and the personal history of the claimant. There was a brief inquiry into her past work as a restaurant " shift manager" but a noticeable lack of questioning as to her present physical abilities and limitations. Although she admitted to doing some cooking, house cleaning, or grocery shopping, there were only two rather general references to the pain that Hartsell claims to have been suffering at the time. At one point she said:

**\*2** ... my legs hurt so bad that I don't get very much rest unless I take something for pain, and I don't take that unless it is absolutely necessary.

At the end of the hearing, the ALJ asked Hartsell if she had anything else to say and she answered:

No, except that my legs. Dr. Rose told me that they would not get any better and that they would gradually get worse. And the only thing they can do is just give me the medication to help ease the pain.

After the record developed in this case, Hartsell underwent surgery for an anterior cervical fusion in the spine. As a consequence she has filed a new claim for disability with the Secretary which is pending. The record is inadequate to determine whether this is corroborative objective evidence of the pain that Hartsell claims she was suffering.

II

It is customary for an ALJ, before initiating testimony from *pro se* claimants, to **inquire** whether they understand that there is a right to counsel. There is no record of the ALJ informing Mrs. Hartsell of this right. A notice from the **Social Security** Administration, addressed to Mrs. Hartsell and advising her of her right to be represented by counsel, was sent to her home before the hearing, but there is no evidence that she ever received it or, if she did, that she understood it. A copy of the notice was placed in the transcript, but it was not marked as an exhibit and introduced into evidence at the hearing.

The Secretary has no duty to insist that a claimant have counsel. *Marsh v. Harris,* 632 F.2d 296 (4th Cir.1980). The fact that Hartsell was not represented by counsel is not in itself reason to reverse the Secretary's decision denying benefits. An ALJ should always take special account, however, of any impairment, such as the lack of counsel, that might effectively disable a claimant from substantiating her claim. In this case, the ALJ might well have inquired whether Mrs. Hartsell was aware of her right to obtain counsel.

Where absence of counsel creates clear prejudice or unfairness to claimant, a remand to the Secretary is proper. *Sims v. Harris,* 631 F.2d 26 (4th Cir.1980). An attorney in this case may have been able to elicit more information about the pain that Mrs. Hartsell claims to have been experiencing and may have been able to expand the testimony on her former job duties.

III

While pain forms the core of Hartsell's claim, little testimony was pursued on the subject. She made one statement about the pain in her legs without

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

861 F.2d 264

861 F.2d 264, 1988 WL 109271
**(Cite as: 861 F.2d 264)**

follow-up. At the close of the hearing, when asked whether she had anything else to say, she replied, " No, *except that my legs*...." There was no follow-up there either.

Subjective evidence of pain is to be weighed in determining disability. *Blalock v. Richardson*, 483 F.2d 773 (4th Cir.1972) ; *Lackey v. Celebrezze*, 349 F.2d 76 (4th Cir.1965) ; *Dillon v. Celebrezze*, 345 F.2d 753 (4th Cir.1965). Additionally, the ALJ is required by 20 C.F.R. § 404.927 to inquire fully into each relevant issue. *Snyder v. Ribicoff*, 307 F.2d 518 (4th Cir.1962), *cert. denied* sub nom *Heath v. Celebrezze*, 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963). The ALJ should scrupulously and conscientiously probe into, inquire of, and explore all relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited. *Marsh v. Harris, supra.* The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris, supra.* Under those circumstances, the ALJ has a "heightened duty of care and responsibility" to fully develop the evidence of an alleged disability. *Sims v. Harris, supra; Crider v. Harris*, 624 F.2d 15 (4th Cir.1980) .

**\*3** It is firmly established that, even though the record as it is presented to the court may contain substantial evidence to support the Secretary's decision, the court may still remand for the taking of additional evidence when the administrative law judge has failed to explore all relevant facts and where the absence of counsel appears to have prejudiced a *pro se* claimant. *Walker v. Harris*, 642 F.2d 712 (4th Cir.1981) ; *Marsh v. Harris, supra.*

### IV

The circumstances in this case of Hartzell's *pro se* prosecution of her claim and the absence of advice to her of a right to have counsel might not, alone, justify remand, although we need not make that determination. The recent surgery on Hartzell's back satisfies the four prerequisites for remand to the Secretary because of newly discovered evidence. *Borders v. Heckler*, 777 F.2d 954 (4th

Cir.1985) ; *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir.1983). The subsequent anterior cervical fusion may be relevant to the determination of disability at the time of Hartsell's initial application in that it might provide objective evidence to support her complaints of pain, and it is not cumulative. Hartsell could not have presented this evidence at the hearing, and she has made a general showing of its nature. This evidence raises sufficient additional questions which, when combined with all the circumstances, persuades us to grant the motion to remand to the district court with instructions to remand this case to the Secretary.

We make no conclusions on the merits of Hartzell's claim. On the contrary, we grant the motion to remand to permit the Secretary to consider the recent developments in Hartzell's condition and to give her the opportunity to amplify the record on the pain she claims in the existing case.

Motion to Remand GRANTED with instructions consistent with this opinion.

C.A.4 (Md.),1988.
Hartsell v. Bowen
861 F.2d 264, 1988 WL 109271

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.